Loring, J.,
dissenting:
When this case was here on demurrer I dissented from the opinion of the majority of the court because I thought that the terms of the award (by which its effect was to be decided) did not necessarily include real estate, as a “ brich-yard ” might be held by lease or license; and that all reasonable presumptions were to be made in support of the award.
And I now dissent from the opinion read by the Chief Justice. I do not concur in its statement of facts, nor in its conclusions as to the conduct, merits, or rights of the parties engaged in the contract for furnishing brick for the Washington aqueduct; hut these matters are not in issue here.
*565 Much of tbe testimony was objected to : I admit none of it in relation to the first objection; and, in relation to the second, I use so much of it only as proves the application of Dr. Bates to the Secretary of War and his reply.
I do not concur with my brethren as to the effect which I understand their opinion to attribute to the joint resolution of February 21, 1861. It is in these words : “ Resolved, fyc., That the joint resolution approved June 15, 1860, for the relief of William H. De G-root, be and the same is hereby repealed, and that the Secretary of War be, and he hereby is, directed to transmit all papers relating to the case of William H. De Groot to the Court of Claims for examination.”
This repealed the resolution of 1860, and would have annulled the tribunal which that constituted, if it had continued to exist; but it did not annul a judgment which that tribunal had rendered a year before, any more than the repeal of the acts constituting this court at this session of Congress would annul a judgment this court had rendered during the last session of Congress.
Then the resolution of 1861 transmits all the papers of this case to this court for examination; and it transmits them all to be dealt with here, each according to its kind and nature, by the rules of law and equity which obtain here, so that each shall have here its proper legal effect in a court of justice. And this is as true of the award as of any other paper in the case; and I can see nothing in the terms or effect of the transmission that annuls or affects the award more than any other paper, or abrogates or controls the jurisdiction of this court as to the award any more, or otherwise, than as to any other paper transmitted.
An award is in the nature of a judgment, and when legal it concludes the rights of parties as much as a judgment of this court or of the Supreme Court. And I can see nothing in the resolution of 1861 upon which there can be imputed to Congress anything like the purpose of annulling by legislation the judgments of legal tribunals, or any purpose of defeating the legal rights of the petitioner, if he had any, under the award.
And whether an award is legal and binding, or not, is a question proper for courts of law; and my conclusion from the resolution of 1861 is, that Congress so held, and therefore sent the case here, that its legal questions, and the validity and legal effect of the award among them, might be decided in a court of law.
I think, therefore, that the resolution of 1861 in no way affects any question presented on this record, nor the action of this court upon it.
*566 The petitioner claims on the award, which is for the payment of money. And the defendants object to it—
First. That the award is beyond the submission.
Secondly. That the Secretary of War was guilty of such misconduct as to vitiate the award.
Thirdly. That there was no account stated, and that the Secretary was not authorized to state an account.
As I think the finding of the Secretary was in effect an award, I have only to consider the two first objections.
As to the first — “ That the award was beyond the submission.” This is to he determined by collating the one with the other.
The submission is made up of the joint resolutions of 1857 and 1860. By the resolution of 1857 the petitioner was to be indemnified for “ all damages, losses, and liabilities ” incurred or sustained by him “ on account of ” the contract for manufacturing brick for the Washington aqueduct; and the resolution required that there should be “first” surrendered “ to the United States all the brick made, together with all the machinery and appliances, and other personal property, prepared for executing the said contract, and that the said contract be cancelled.” And this was a condition precedent to the adjustment of the contract. I think it may be held that the resolution thus referred to that adjustment, the circumstances it made antecedent to it, and submitted those circumstances and their consequences to the judgment of the arbitrator, as among the matters for which indemnity was to be awarded. If this is so, then the words “ damages, losses, and liabilities,” in the resolution of 1857, would include the loss sustained by the petitioner in the final settlement and disposition of the contract in the way which the resolution required, viz., by the surrender of the property specified in it.
And, apart from such construction, the inference from the resolution ■is that the United States desired, what it proposed, the determination and final settlement of the contract “ on principles of justice and equity,” provided they could acquire the means of carrying on the work thereafter. And it is not a necessary or proper inference from this that they intended, or the petitioner understood, that he was to surrender his contract and property without a specific compensation for them.
The award shows that the condition was fulfilled, and that there was surrendered to the United States the contract, the brick made, the machinery, &c„ of the brick-yard, and the brick-yard itself; and the *567 allowances made are for tbis property surrendered. I think, for the reasons stated, that the arbitrator was authorized to allow for it.
But, as to the first item allowed, the defendants objected that the brick-yard was not within the submission, because it was not specified in the resolution of 1857, and was transferred to the United States by a lease made after the contract was cancelled, and for future use and occupation, and which was not, therefore, “personal property pre-paredfor executing the contract.” It is observable that the award does not mention the lease, nor purport to allow for it. But, admitting the objection to be true in fact, and that the delivery of the brick-yard was made as stated, I think it is answer enough to the objection that the award shows (Index, p. 18) that the United States received such delivery under the resolution of 1857; for they thereby, by their own act, placed it within the resolution, and they are now estopped from saying it was not within it; for a party cannot, at law, or in equity, or in common honesty, accept and hold a benefit and at the same time repudiate the means by which he acquired it.
But I think the allowance for the brick-yard, its appurtenances and improvements, &c., was, at all events, within the resolution of 1860. This authorized the arbitrator to allow the petitioner “ the amount of money actually expended by him in and about the execution of said contract.” I think these words, in their strictest meaning, authorized the allowance of the expenditures of the petitioner for the brick-yard, See.., which the award makes and states in these terms : “ Such items of expenditure as were necessarily involved in the purchase and improvement of the brick-yard and its appurtenances.”
It is to be remembered that when the resolution of 1860 was passed the defendants had held and used the brick-yard for three years, and they knew their future tenure and use of it; and if such use would use up its whole value, or was worth its cost, this may have been a reason with the legislature for inserting words in the submission which would cover its cost, and with the arbitrator for allowing it. But with ’ the reasons of the legislature, or the reasonableness of the arbitrator’s allowances, we have nothing to do. On this objection we are to take the words of the legislature as they appear on the submission, and the acts of the arbitrator as they appear on the award; and, on the collation of these, the question is, whether the terms of the resolution, viz., ‘‘ the amount of money actually expended,” See., include “ the items of expenditure” allowed. I think they do.
It was contended on behalf of the United States that the arbitrator disclaimed allowing anything under the resolution of 1860 for “money *568 actually expended,” &c., and made all bis allowances under tbe provision for “ damages, losses, and liabilities” in the resolution of 1857. I do not so construe tbe award. I tbink tbe disclaimer of tbe arbitrator applies only to tbe incidental expenses of carrying on tbe brickyard, which would be included in tbe allowance for tbe brick made. These be specifies as “ tbe outlay” for tbe transportation of brick, for subsistence of bands, for tbe manufacturing of bricks, &c. (Index p, 18.) But if tbe fact was according to tbe objection, I tbink it would be immaterial, for it would only show that tbe arbitrator attributed to one clause in tbe submission a power given to him by another. This might impugn his logic, but not bis award; for it would not show that be bad used a power not given him, or that tbe award was beyond the submission.
The second item allowed is “ estimated profits” — #86,922.81. To this the defendants objected as follows : “ In connection with contract tbe word ‘ damages’ is appropriated by legal usage to loss arising from a breach thereof exclusively.” That such is tbe meaning of tbe word “ damages” when it is used, as in legal language it generally is, in reference to a broken contract, is true; but this is a case not of a broken contract, but of a cancelled contract, and so the award treats it. And the1 word “ losses,” as well as “ damages,” is used in tbe resolution, and tbe former means something more and. other than tbe latter, and is not technical. Where a party has surrendered a contract of value, that value which be has parted with is bis loss, and the measure of bis loss, by tbe surrender; and to indemnify him for that loss you must pay him tbe value of the contract. There are two modes of ascertaining tbe value of a contract, either by its sale in tbe market, or by ascertaining the profits it would have produced if performed. A cancelled contract cannot be sold, and therefore tbe other mode of ascertaining tbe value of tbe contract in this case was adopted by tbe arbitrator.
This is shown on tbe face of tbe award, for the arbitrator states the testimony on which bis result was reached. The words “ estimated profits” are thus shown by the award to signify tbe value of tbe contract cancelled ; and that was to be paid for, if any of the property surrendered was to be paid for; for the purpose of tbe submission was indemnity; and as to that, it submits the whole case to tbe arbitrator, to be adjusted on principles of justice and equity, and distinguishes in no way between tbe different items of property which it requires to be surrendered to tbe United States.
It was contended for tbe defendants that tbe contract for manufac *569 turing brick for tbe "Washington, aqueduct was onerous to those who undertook its execution, and that the motive on the part of the government, in the resolution of 1857, “ could have been no other than to release the contractors from a burdensome contract,” and to indemnify them for their expenses under it, on the surrender of the property specified in the resolution of 1857, as the price of its benefits. — (De’fts Brief, p. 8.)
I know of nothing in the case which supports this theory. It is based on the assertion that the contract was burdensome. But the award fixes the fact that the contract was profitable; and, as it thus disproves the assertion, it disproves the theory founded on it; and we are not to construe the submission by assuming facts which it does not state, and which the award disproves.
It was contended for the defendants that the contract of Digges & Smith was never cancelled; but that contract is not specified in the submission, and it maybe that in fact it was only the terms of another agreement made subsequently in behalf of the United- States, and availed of by them, and' recognized by the resolutions of 1857 and 1860. But, however that may be, the award fixes the fact for this hearing that the contract referred to in the submission was cancelled, and that the beneficial interest in that, as well as in the other property, was in the petitioner.
For the reasons stated, I think it is not shown that “ the award was beyond the submission.”
The second objection to the award is, “ that the arbitrator was guilty of such misconduct as to vitiate the award.”
The only ground on which this is claimed is, that the Secretary declined the application of Dr. Bates, made August 16, I860, (Exhibit A, De’fts Ev., p. 16,) to file a statement of his “ interest in the contract” before him.
Such a statement, if filed, would not have been evidence; and Dr. Bates could only be admitted as a party or a witness. He claimed to be a party in interest. The Secretary replied that he had no authority to admit him as a party. — (De’fts Ev., Exhibit B, p. 17.) This was true, and it is all the Secretary did about it. The duty of the Secretary under the submission was to hear the parties and the witnesses produced by them. It is not claimed that either party proffered Dr. Bates as a witness ; and if neither party called him, the presumption is that neither party wished him as a witness.
I think the objections have not been sustained, and that the petitioner is entitled to judgment on the award.